**Chadwick Sterling McGUIRE**

v.

**ENSCO MARINE COMPANY.**

**CIV. A. No. G–99–380.**

United States District Court,
S.D. Texas,
Galveston Division.

April 20, 2001.

Ronald L. White, White Mackillop & Baham, P.C., Houston, TX, mediator.

Richard Lee Melancon, Michael W. Hogue, Melancon and Hogue, Friendswood, TX, Paul N. Vance, Ungar Byrne et al., New Orleans, LA, for Chadwick Sterling McGuire.

Robert L. Klawetter, Eastham Watson Dale & Forney, Houston, TX, for Ensco Inc., Ensco Offshore Co., Ensco International Inc. and Ensco Marine Company.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KENT, District Judge.

A non-jury trial of this cause was held before this Court on September 20, 2000, and September 25, 2000, Honorable Samuel B. presiding. The Court, having considered all pleadings heretofore filed herein, the pre-trial order; together with substantial attachments, all post-trial submissions submitted by both parties and the applicable law, and having carefully considered all trial testimony and exhibits, particularly including a number of live witnesses, and having considered the arguments of counsel, hereby enters its Findings of Fact and Conclusions of Law, as provided in Rule 52 of the Fed.R.Civ.P.

## I.

### NATURE OF THE CASE

1. This is a Jones Act and general maritime law action brought by Chadwick Sterling McGuire, Captain of the M/V ENSCO ATLAS, against Defendant Ensco Marine Co. (hereinafter "Ensco"). Plaintiff filed this case alleging that as a result of Ensco's negligence and the unseaworthiness of the M/V ENSCO ATLAS, he sustained low back and neck injuries when he was pulling on a "shock" line as part of connecting an emergency tow cable on November 1, 1998.[1] Defendants vigorously deny that Plaintiff was pulling on a shock line and deny that Plaintiff has suffered injury.

## II.

### FINDINGS OF FACT

1.

On November 1, 1998, the crew and officers of the M/V ENSCO ATLAS, including Plaintiff himself, were in the employ of Ensco and Ensco owned and operated the M/V ENSCO ATLAS. Both venue and jurisdiction are proper in this Court.

2.

Mr. McGuire is a 41 year old man from Pass Christian, Mississippi. Although he dropped out of high school, he eventually completed a G.E.D. He began going to sea in 1975 and obtained his Captain's license in 1978. Mr. McGuire has substantial wheelhouse experience aboard numerous sea-going vessels, but prior to his employment with Ensco he had limited experience as a tow captain aboard vessels such as the M/V ENSCO ATLAS.

---

1. Defendant makes much in its defense about the fact that no shock line was rigged on the vessel. The Court agrees. But, Plaintiff was pulling on a line and was injured while doing so.

### 3.

Mr. McGuire began his employment with Ensco in 1996. About one and a half months prior to the occurrence on which this suit is based, Mr. McGuire was on another Ensco vessel that sank. As a result of this incident he experienced a contusion to his back and a cut on his elbow requiring three stitches. Following this incident he saw a physician on only one occasion and was prescribed minimal anti-inflammatory medication. Mr. McGuire returned to work without restrictions as soon as his license and other official documents, lost in the sinking, could be replaced. He made no claim against Ensco as a result of that incident.

### 4.

As Relief Captain aboard the M/V ENSCO ATLAS, an offshore towing vessel, Mr. McGuire was primarily responsible for duties in the wheelhouse.

### 5.

At the time of the accident herein, the M/V ENSCO ATLAS was on the homeward leg of a voyage from Brownsville, Texas to Santa Marta, Columbia, with the offshore barge, Boa # 8, in tow. The Master was Mr. Ordell J. Saunders. An additional Relief Captain, Mr. Steven Yaun, was also on the vessel at the time of the accident.

### 6.

The Defendant's first in a series of acts of negligence that culminated in Plaintiff's injury on the back deck of the M/V ENSCO ATLAS was Defendant's failure to provide Captain Saunders with the chafing gear he requested. Prior to the commencement of the voyage, Captain Saunders had discussed the need for chafing gear with his first and second mate who both asked him if this gear was available. Defendant's Operations Manager denied Captain Saunders' request for chafing gear. If chafing gear had been made available, it would have been used instead of having to play the towing cable in and out. Had chafing gear been used on the vessel, there would have been no need to adjust the cable length. Without the use of chafing gear, the engineer was forced to pick up and let out 2'–4' of the 2500' tow cable from time to time to reduce wear on the cable. Failure to have such gear onboard constituted negligence. Such negligence proximately led to Plaintiff's injuries.

### 7.

During this exercise, the vessel's Engineer, James Shafer, inadvertently but negligently grabbed the wrong lever, causing the drum to start freewheeling with the result that the entire 2500' of steel main tow cable went over the stern of the vessel and into the sea. Without the towing cable attached, the barge drifted out of control in 3'–4' seas and 6'–8' swells with intermittent rainstorms. Such negligence proximately led to Plaintiff's injuries.

### 8.

Due to the loss of the barge and the towing cable, Captain Saunders ordered every able-bodied seaman on deck to assist in retrieving the barge. Plaintiff was off watch at this time, but due to the emergency situation, he was called back to work.

### 9.

Prior to performing any task that might be considered dangerous, Defendant's policy required that a Job Safety Analysis (JSA) be performed and logged. The JSA required a consideration and listing of all action to be taken to perform the required task and the sequence of each step to be taken as well as an identification of any risk or danger and the ways to prevent such exposure. In spite of the importance of the JSA coupled with the importance of his position and example, Captain Saun-

ders failed to log the meeting he alleges was a JSA prior to commencing the emergency tow cable operation. Rather than a JSA meeting, the gathering in the wheelhouse on November 1, 1998 was a brief, impromptu gathering of the crew getting orders from Captain Saunders of the action he wanted the crew to take. Failure to have a valid JSA constituted negligence, which proximately caused Plaintiff's injuries.

10.

A previous JSA authored by Captain Saunders on October 1, 1996, as the employee with the highest level of authority and the most responsibility on the vessel on the day of the accident, stated that a shock line was to be used in connecting a towing cable.

11.

Initially, attempts were made to pull up the tow cable by having Plaintiff, Deckhand Donald Menefield and Captain Saunders jump from the vessel to the drifting barge to try to get into the control room on the barge. However, the attempt to use the winch in the barge's control room was futile because the control room was locked and no one with the M/V ENSCO ATLAS had a key.

12.

While in communication with defendant's operations department, Captain Saunders attempted on numerous occasions to snag or otherwise retrieve the lost towing cable beneath the barge, but was unable to do so. Finally, as time was running short to retrieve the barge before night fall, the order was given by Captain Saunders to secure the emergency tow cable on the barge to the second spool of wire on the winch of the vessel. The back deck of the vessel was wet and slippery while Plaintiff and others hurried on deck to try and rig the emergency tow cable. The wooden portion of the back deck had no non-skid paint on it. During the voyage, the movement of the main tow cable had rubbed off areas of the nonskid paint on the metal surface of this deck. This constituted an unseaworthy condition which proximately caused Plaintiff's injuries.

13.

At the time of the incident involved herein, the M/V ENSCO ATLAS was equipped with heavy lines, which Defendant's JSA provides are to be used in connecting towing cable. Consistent with this JSA, Plaintiff and Donald Menefield proceeded to move a heavy line into position by using a J-hook to pull this line across the back deck of the vessel. Captain Saunders was at the winch controls during this activity, serving as the safety observer and barking orders over the PA system.

14.

Captain Yaun was at the stern controls of the vessel while the emergency tow cable was being connected. Captain Saunders admitted that it was unsafe to man-handle the heavy line with the J-hook as opposed to pulling it with the vessel's tugger. Nonetheless, as shown in the video of this voyage, Captain Saunders had on an earlier date in this same voyage observed other crewmen pulling the heavy line across the deck with a J-hook and made no effort to correct them. Such inconsistent conduct constitutes negligence, which proximately caused Plaintiff's injuries.

15.

Since this was an urgent, hurry up operation, Plaintiff and Donald Menefield did not have time to rig the tuggers to assist in the movement of the heavy line but instead were ordered by Captain Saunders to move it manually with a J-hook. Moving the heavy line manually with a J-hook was necessitated by the hurry up situation at hand. During this manual maneuvering

of the heavy line on the heavy, wet and slippery back deck of the M/V ENSCO ATLAS, Plaintiff felt a strain or pull on his low back as the entire weight of the line was placed on him when, in the process of jerking on the heavy line, he slipped and fell to one knee. This was the only time during the entire operation that Plaintiff felt such a pull or strain.

### 16.

Kenneth Jones, a deckhand on the back deck at the time of this manhandling of the heavy line, observed this operation being performed and turned at one point to see Plaintiff grab his low back area. Mr. Jones was "sure" in his testimony that Plaintiff was pulling a heavy line with Donald Menefield. This was the only time or occasion in the process of connecting the emergency tow cable that Plaintiff noted any effect on his low back. Later that day, as Plaintiff was showering after the emergency recovery of the barge had been completed, he began to experience pain in the same area of his low back where earlier, while pulling the heavy line, he had felt the pull or strain. Plaintiff timely reported his injury that evening.

### 17.

Defendant's witnesses testified that they had no reason to doubt Plaintiff's version of the accident and they did not believe he was the kind of individual who would commit perjury. Captain Yaun testified that it was possible for someone on the stern deck to have slipped during the operation and not be seen having done so.

### 18.

Donald Menefield, in contrast to all other witnesses in this case, testified that the seas were CALM and the skies were clear while he was working on the stern deck. Mr. Menefield, in claiming he never saw Sterling McGuire slip or fall on the stern deck, testified as to pulling some "line" on the deck with a J-hook but he could not remember which one. He confirmed that they possibly may have been using a J-hook in the efforts to connect the emergency tow line. Unlike Captain Saunders and other defense witnesses, he denied there was any water on the back deck and finally admitted that "I don't remember one way or the other" if Sterling McGuire fell. He claimed he did not even know where Plaintiff was. His testimony is not credible in refuting Plaintiff's allegations.

### 19.

Stephen Yaun saw Mr. Menefield working as a team on the back deck with Mr. McGuire. Shortly after the accident of November 1, 1998, Deckhand Kenneth Jones gave a recorded statement to Defendant's adjuster confirming his trial testimony, in particular his having seen Plaintiff grabbing or holding his low back. Plaintiff has consistently told his treating physicians that he was injured pulling lines on the back deck during the process of connecting the emergency tow cable, and the Court believes Plaintiff's version of this case.

### 20.

In his deposition, Plaintiff completed a sketch that showed the heavy line and the spot at which Plaintiff felt the pull or strain in his low back when he slipped. On November 2, 1998, an Illness and Injury Report was completed in connection with Plaintiff's accident. Captain Saunders, Captain Yaun and Engineer Shafer all signed the Illness and Injury Report, affirming that they were eyewitnesses to the accident related by Plaintiff. None of these eyewitnesses had any reason to doubt Plaintiff's testimony. Captain Yaun could not say that Plaintiff was the kind of individual who would perjury in order to try to get a monetary recovery. No witness can or did refute that Plaintiff slipped and fell to one knee on the back deck as he participated in efforts to connect the emergency tow cable. Defendant's witnesses

who claimed not to have seen the slip or fall conceded that it was possible that this occurred and they simply did not see it.

### 21.

Following his injury on November 1, 1998, during the voyage to Brownsville, Texas, Plaintiff initially underwent medical treatment by Dr. Charles Winters in Biloxi, Mississippi on November 20, 1998, at which time Plaintiff told Dr. Winters he had injured his back on November 1, 1998, while pulling towlines on the M/V ENSCO ATLAS. A lumbar MRI done on December 1, 1998 revealed mild disc space narrowing, with associated disc desiccation at L1–2 and L2–3.Dr. Winters continued to treat Plaintiff through April 21, 1999, during which period of treatment Dr. Winters concluded that Plaintiff had a lumbar sprain caused by the incident of November 1, 1998. Dr. Winters was of the opinion that Plaintiff had a 5% permanent partial impairment to his back associated with this strain which will cause Plaintiff to experience intermittent back problems throughout the remainder of his life. As of April 21, 1999, Dr. Winters felt that Plaintiff could perform light duty work with permanent restrictions against lifting, pushing or pulling greater than 10—15 pounds.

### 22.

Dr. Joe Jackson, a Board certified neurologist, examined Plaintiff on May 11, 1999, on referral from Dr. Winters. Plaintiff reported to Dr. Jackson that he was injured on November 1, 1998, when he was slipping and sliding on the back deck of the M/V ENSCO ATLAS, as he pulled towlines. On examination, Dr. Jackson noted muscle tightness at the L2, L4 and L5 levels. Dr. Jackson was of the professional opinion that Plaintiff suffered at least a ligamentous strain/sprain-type injury to his low back with associated trigger points as a result of the accident of November 1, 1998. Dr. Jackson described trigger points as areas of hard muscle

mass, associated with muscle spasm over time. He related these trigger points to the accident of November 1, 1998. Plaintiff's trigger points were injected by Dr. Jackson on June 11, 1999 and again on June 22, 1999. Dr. Jackson felt that a discogram would be a useful diagnostic tool in diagnosing lumbosacral problems causing pain in Plaintiff's low back that might not appear on an MRI.

### 23.

Dr. Bruce Weiner, the Defendant's IME doctor, saw Plaintiff only once on February 25, 2000, at which Plaintiff complained of low back pain. Dr. Weiner found no spasms or list or trigger points on physical examination and diagnosed Plaintiff with a strain of his low back, notwithstanding that x-rays done by Plaintiff's prior physicians did show a minimal list. He testified that his review of Plaintiff's lumbar MRI showed only mild degeneration. However, none of Plaintiff's prior diagnostic testing showed any significant degenerative changes at the L5–S1 level. He further admitted that the discogram done in May, 2000 showed abnormalities at L5–S1 but he discounted the findings of this diagnostic test and did not consider them in reaching his conclusion that surgery was not warranted.

### 24.

Plaintiff's EMG, performed on September 14, 1999, showed a left S–1 radiculopathy, which is at the L5–S1 disk. Dr. Weiner felt that as of approximately April 1999, Plaintiff would have reached maximum medical improvement and that, contrary to Dr. Winters, Dr. Jackson, and Dr. Cupic, he would have been able to resume work with no restrictions as to lifting, pushing or pulling.

### 25.

Dr. Zoran Cupic is Plaintiff's treating physician and has often been recognized

by the Court as an expert under Fed. R.Evid. 702. Dr. Cupic first saw Plaintiff on June 25, 1999. Dr. Cupic is of the opinion that Plaintiff suffered from a herniated disc at L5–S1 which, in all reasonable medical probability, was caused by his pulling on a 6-inch line in rough water. Plaintiff had objective evidence of injury in the form of spasm in his lumbosacral area, a markedly reduced range of motion in his low back, a positive straight leg raising test and an abnormal lumbar MRI at L1–2 and L2–3. Dr. Cupic ordered an EMG and a discogram, the former of which showed radiculopathy at S1 nerve root level on the left side. The discogram was positive as well at the L5–S1 level, confirming the presence of a herniated disc.

### 26.

A laminectomy and disk incision with a fusion was performed by Dr. Cupic on June 15, 2000. While Plaintiff has improved post-surgery, he is still in a back brace and will have to continue with this brace for 5–6 months after surgery.

Plaintiff will not be in a condition to be evaluated for any form of work until a minimum of one year from June, 2000. Dr. Cupic is of the opinion, to a reasonable medical probability, that Plaintiff will have some degree of pain for the rest of his life as a result of the low back injury he suffered on November 1, 1998 and that he will have permanent physical limitations against lifting in excess of 15–20 pounds, climbing, excessive bending, stooping, squatting, prolonged standing and working on uneven surfaces, which limitations will permanently restrict Plaintiff from ever returning to work aboard any type of vessel at sea. Plaintiff will be limited to sedentary or light work that does not jar on put stress on Plaintiff's back.

### 27.

Plaintiff's future medical treatment over the next 30 years in connection with his low back will, in Dr. Cupic's opinion, be approximately $1000 per year. Plaintiff's unpaid or past due medical cure is as follows:

| | | |
|---|---:|---|
| Dr. Zoran Cupic | $ 28,623.00 | (Plaintiff's Ex. 24) |
| Diagnostic Management Affiliates | 2,528.00 | (Plaintiff's Ex. 47) |
| Eckerd Drugs | 205.66 | (Plaintiff's Ex. 49) |
| Dr. Hosni Bassili | 1,746.00 | (Plaintiff's Ex. 50) |
| Memorial Pathology | 80.71 | (Plaintiff's Ex. 51) |
| Med. Arts Pharmacy | 2,013.45 | (Plaintiff's Ex. 52) |
| La. Clinic | 3,313.27 | (Plaintiff's Ex. 53) |
| Cardiovascular Diagnostics | 40.00 | (Plaintiff's Ex. 54) |
| Hospital Drug Store | 36.13 | (Plaintiff's Ex. 55) |
| Memorial Hermann Hospital System | 10,938.70 | (Plaintiff's Ex. 56) |
| | $ 49,524.92 | |

In Dr. Cupic's opinion, these bills reflect necessary treatment and reasonable expenses as a result of the injury of November 1, 1998.

**28.**

Prior to the injury of November 1, 1998, Plaintiff was working at full duty without any complaints or limitation relative to his low back. Based upon its evaluation of all of the testimony and other evidence in the case, this Court finds that the Plaintiff was injured in the course and scope of his employment on November 1, 1998.

**29.**

The Court recognized, without objection from Defendant, Dr. Kenneth G. McCoin, as an expert in evaluation of economic loss pursuant to Fed.R.Evid. 702. According to the testimony of Dr. McCoin, Plaintiff had a work life expectancy of 20.6 years and a life expectancy of 34.6 years at the date of trial, based upon the Work Life and Life Expectancy tables of the United States.

**30.**

Plaintiff had base annual earnings of $72,900 as of the date of the accident based on a pay rate of $300 a day and 243 work days per year. The daily rate being paid by Ensco is currently $325 a day. To calculate future losses, Dr. McCoin used a below-market discount rate of one and one-half percent, in compliance with the appropriate standards enunciated in *Culver II* and its progeny. Dr. McCoin opined that Plaintiff has sustained past lost wages of $99,558.00 and $1,105.00 in loss of household services as of the date of trial. Dr. McCoin also testified that Plaintiff will sustain a future loss of wage earning capacity in the sum of $ 1,031,611, assuming Plaintiff begins working on January 1, 2003 at a $12.50 per hour job, which the Court finds substantially persuasive. Finally, Dr. McCoin stated Plaintiff will sustain future losses of $29,225 in household services.

**31.**

Defendant retained Dr. James Yeager as its economist. Dr. Yeager based his opinions about Plaintiff's earning capacity on Plaintiff's 1997 earnings "inflation adjusted to 1998," instead of using Plaintiff's actual 1998 wages. In fact, Dr. Yeager's flawed methodology projected an income figure for the Plaintiff's 1998 earnings that are even below what Plaintiff actually earned through the middle of November of that year. Dr. Yeager does not provide a sufficient basis for reducing Plaintiff's earnings by his so-called "age-earnings" analysis. Dr. Yeager was not even aware of Plaintiff's daily wages at the time of the accident or what changes there have been to Ensco Captain and Relief Captain's wages since November 1, 1998. In short, this Court does not find Dr. Yeager's testimony or economic analysis either reliable or persuasive.

**32.**

The Court recognized William Kramberg, Plaintiff's vocational rehabilitation specialist, as an expert in evaluation of rehabilitation pursuant to Fed.R.Evid. 702. Based upon the testimony of Mr. Kramberg, and based on the evidence before the Court, Plaintiff will be, after his release by Dr. Cupic, limited to sedentary to light duty jobs in the $10.50—$10.75 hour. With 2 ½—3 years of retraining, Plaintiff might expect to find employment in the $10–$15 hour range (with an average of $12.50 per hour). The cost of this training over 2½—3 years will be $8,000. Plaintiff is permanently restricted from work aboard any vessels. The Defendant's vocational rehabilitation specialist, Willie Quintanilla, testified that the position of Relief Captain is at least a medium level job requiring occasional lifting of 50 pounds and repetitive lifting of 25 pounds. Mr. Quintanilla agreed that Plaintiff cannot go back to work on boats and that, based on Dr. Cupic's testimony, he can only do sedentary work.

33.

The parties stipulated that maintenance was terminated on February 25, 2000.

34.

Based upon the totality of evidence in this case, the Court finds and concludes that the Plaintiff has sustained the following losses by a preponderance of the evidence:

a. for the physical pain, mental anguish, and suffering sustained by Chadwick Sterling McGuire from the date of his injuries on November 1, 1998 and through the date of trial, the amount of $125,000.00;

b. For the physical pain, mental anguish, and suffering sustained by Chadwick Sterling McGuire from the date of trial until the end of his life expectancy of 34.6 years, the amount of $125,000.00;

c. For permanent physical impairment from November 1, 1998 until the date of trial, the amount of $10,000.00;

d. For permanent physical impairment from the date of trial until the end of Plaintiff's life expectancy of 34.6 years, the amount of $10,000.00;

e. For loss of wages in the past from the date of the incident until the date of trial, the sum of $99,558.00;

f. For loss of past household services from the date of the incident until the date of trial, the sum of $1,105.00;

g. For future loss of wage earning capacity and the cost of re-training, the sum of $500,000.00;

h. For future loss of household services the sum of $7,500.00;

i. For the reasonable and necessary cost of past medical care, the sum of $49,524.92;

j. For the reasonably probable cost of medical care in the future and until the end of Plaintiff's life expectancy of 34.6 years, at $1,000.00 per year, the sum of $34,600.00;

k. The Court finds maintenance was terminated on February 25, 2000 a date before the Plaintiff had reached maximum medical improvement. The Plaintiff will reach maximum medical improvement on June 1, 2001. The Court further finds that the sum of $20.00 a day was previously paid by Defendant and such sum is reasonable under the facts of this case. The Court awards the Plaintiff the sum of $20.00 a day for a total of 460 days in the amount of $9,200.00.

l. The Court finds that an award of pre-judgment interest is proper in this case. Accordingly, the Court finds and awards pre-judgment interest on all damages accrued through the entry of Judgment, to run at the prevailing rate of interest as prescribed in 28 U.S.C. § 1961.

35.

The Court finds Defendant 80% liable for the foregoing damages and Plaintiff 20% liable therefore.

## CONCLUSIONS OF LAW

1.

This is a case of admiralty and maritime jurisdiction.

2.

At the time of his injury on November 1, 1998, the Court concludes that Plaintiff Chadwick Sterling McGuire was a "seaman" as that term is legally defined under the Jones Act, and was employed by Defendant Ensco Marine Co.

3.

The injuries sustained by Plaintiff McGuire were proximately caused 80% by the foregoing negligence of Defendant Ensco Marine Co., and/or in failing to provide a safe place to work and the consequent

unseaworthiness of the M/V ENSCO AT-LAS. Defendant Ensco is the legal owner of the M/V ENSCO ATLAS. The negligence and unseaworthiness were each and both a legal and proximate cause of Plaintiff's injuries. The Court finds Plaintiff 20% legally responsible for his own injuries.

4.

To the extent any Finding of Fact constitutes a Conclusion of Law, the Court hereby adopts it as such. To the extent any Conclusion of Law constitutes a Finding of Fact, the Court hereby adopts it as such.

5.

Plaintiff is entitled to pre-judgment interest from the date of loss at a rate of 6.0%, and post-judgment interest at the rate of 7.0% per annum until satisfaction of Judgment.